IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JERRI BEITEL, | ) | CASE NO. 5:16-cv-02649 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jerri Beitel ("Plaintiff" or "Beitel") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying in part her applications

for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Doc. 1.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned finds that the ALJ's analysis of the

opinion of Beitel's treating physician fails to satisfy the treating physician rule and recommends

that the Court **REVERSE and REMAND** the Commissioner's decision for further proceedings

to ensure adherence to that rule.

# I. Procedural History

On January 24, 2014, Beitel protectively filed applications for DIB and SSI.[1]  Tr. 19, 154-167.  She alleged a disability onset date of May 3, 2013 (Tr. 19, 155, 160), and alleged disability due to diabetes, herniated disc, and pinched nerve (Tr. 55, 65, 77, 86, 97, 100, 187).  After initial denial by the state agency (Tr.  97-102) and denial upon reconsideration (Tr. 109-120), Beitel requested a hearing (Tr. 121-128).  A hearing was held before Administrative Law Judge Charles R. Shinn ("ALJ") on September 24, 2015.  Tr. 32-54.

On October 14, 2015, the ALJ issued a partially favorable decision (Tr. 15-31), finding that Beitel was not disabled prior to April 28, 2015, the date when her age category changed for purposes of Social Security disability analysis, but that she became disabled on that date and continued to be disabled through the date of the decision (Tr. 19, 27).  Beitel requested review of the ALJ's decision by the Appeals Council, seeking a fully favorable decision as of the alleged onset date. Tr. 14.  On September 15, 2016, the Appeals Council denied Beitel's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.     Personal, educational, and vocational evidence

Beitel was born in 1960.   Tr. 155, 160.   She was 54 years old at the time of the hearing.  Tr. 36.  Beitel graduated high school.  Tr. 38, 188.   Beitel lives in a house by herself.  Tr. 38.  Beitel worked for 33 years at Cardinal, with her last position at Cardinal being that of lead

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 8/30/2017).

floater, quality control.  Tr. 46-47.  She inspected parts and lines for breaks.  Tr. 47.  Beitel

stopped working on May 3, 2013, because of problems with her back.  Tr. 46-47.  Beitel does not

think that she could work at her prior job any longer because the required walking, bending,

twisting and lifting as much as 33 pounds would be hard for her.  Tr. 47.

## B.    Medical evidence

### 1.    Treatment records

Beitel's history of diabetes[2] and back problems began prior to her May 3, 2013, alleged

onset date, with treatment beginning at least in 2009 by her treating physician Dr. Kanubhai

Patel, M.D.  *See e.g.,* Tr. 243-244, 247, 264-265; Doc. 11, p. 2.

On May 13, 2013, Beitel saw Dr. Patel complaining of lumbar pain, with on and off pain

into her right thigh.  Tr. 260.  Dr. Patel recommended a lumbar spine MRI.  Tr. 260.  Beitel

indicated a desire to wait and wanted an injection since it had helped her in the past.  Tr. 260.  A

week later, Beitel returned to see Dr. Patel reporting that her pain was worse with the pain going

all the way down to her right ankle.  Tr. 251.  Beitel was taking Vicodin.  Tr. 251.  Dr. Patel

recommended switching to Percocet once Beitel was finished with her Vicodin.  Tr. 251.  Dr.

Patel diagnosed lumbar radiculopathy R/O herniated lumbar disc.  Tr. 251.  Dr. Patel prescribed

a Medrol Dosepak and again discussed the need for an MRI.  Tr. 251.  Beitel was not interested

in an MRI due to the costs.  Tr. 251.  Beitel denied any numbness or tingling.  Tr. 251.  Beitel

returned about a week later reporting no improvement in her pain and agreed to proceed with an

MRI.  Tr. 259.  Dr. Patel scheduled the lumbar spine MRI.  Tr. 259.  On May 31, 2013, Beitel's

lumbar MRI (Tr. 253-254) showed:

> [A] [m]oderate-sized disc extrusion on the right side with cephalad migration that
> is causing thecal sac deformity and displacing the L4 nerve root . . . There is

---

[2] Beitel's challenge to the ALJ's decision pertains to the ALJ's assessment of her back problems, not her diabetes.
Accordingly, the medical evidence summarized herein is limited to her back problems.

extension into the medial foramen also.  Mild left lateral recess stenosis at this level also.

Mild degenerative changes at other levels[.]

Tr. 253.

Upon Dr. Patel's referral, on June 13, 2013, Beitel saw Dr. Tracy Neuendorf, D.O., F.A.O.C.A., at the Barberton Pain Management Center.  Tr. 291-293.  Dr. Neuendorf set forth her impressions and findings in a letter to Dr. Patel.  Tr. 291-293.  Dr. Neuendorf found that the May 31, 2013, MRI confirmed that Beitel had a "protruding disc at L4-5, neuroforaminal stenosis at L4-5, lumbar radiculopathy right leg, degenerative osteoarthritis with facet hypertrophy and facet syndrome at L2-3, L3-4, L4-5 and L5-S1, bulging disc at L3-4, L4-5, L5-S1, chronic pain."  Tr. 291.  On examination, Dr. Neuendorf's observations included positive neurogenic claudication in Beitel's right leg, negative straight leg raise, positive sensory deficit in the right leg, mild arthritis in both hips and knees, and positive facet loading at L3-4, L4-5, and L5-S1.  Tr. 292.  Dr. Neuendorf diagnosed: (1) protruding disc at L4-5, neuroforaminal stenosis at L4-5; (2) lumbar radiculopathy – right leg; (3) degenerative osteoarthritis with facet hypertrophy and facet syndrome at L2-3, L3-4, L4-5 and L5-S1; (4) bulging disc at L3-4, L4-5, and L5-S1; and (5) chronic pain.  Tr. 292.  Following discussions with Beitel, Dr. Neuendorf's recommendations were to continue with low-velocity home exercises and physical therapy program; continue ongoing conservative care as previously prescribed and as continued by Dr. Patel; consider psychological support services; and proceed with a series of L4-5 epidural injections.  Tr. 292.

Beitel's first epidural injection was administered on June 13, 2013.  Tr. 289-290.  On July 18, 2013, when Beitel presented for her second of three injections, Beitel reported 50-60% relief

from the first injection.  Tr. 288.  Beitel also reported 50-60% relief from the second injection

and the third injection was administered on August 1, 2013.  Tr. 286-287.

On July 30, 2013, Beitel saw Dr. Patel.  Tr. 252.  She reported continued lumbar pain into

her right lower extremity with numbness and tingling in her right lower extremity.  Tr. 252.  In

contrast to her reports to pain management, Beitel reported to Dr. Patel that she had not

improved with the injections.  Tr. 252.  Dr. Patel recommended that Beitel consult with a spine

surgeon.  Tr. 252.  Beitel was taking Percocet pills for her pain.  Tr. 252.   On examination, Dr.

Patel observed tenderness in her lumbar area and painful knee and ankle reflexes.  Tr. 252.

On August 15, 2013, Dr. Patel referred Beitel to spine surgeon Paul W. Hartzfeld, M.D.

for further evaluation.  Tr. 252.  Dr. Patel's diagnoses were large herniated disc and lumbar

radiculopathy.  Tr. 252.

Beitel saw Dr. Hartzfeld for a consultation on September 3, 2013.  Tr. 271.  Dr. Hartzfeld

reviewed Beitel's history, including reports of back and right lower extremity pain since May,

and her lumbar spine MRI.  Tr. 271.  On examination, Dr. Hartzfeld observed 5/5 strength

throughout Beitel's upper and lower extremities.  Tr. 271.  Dr. Hartzfeld concluded that Beitel

had right L5 and possibly L4 radiculopathy.  Tr. 271.  Upon consideration of the length of time

that Beitel had been symptomatic and how much her condition was bothering her, Dr. Hartzfeld

recommended an L4 laminectomy with L4-L5 diskectomy.  Tr. 271.  Beitel indicated she wanted

to proceed with surgery.  Tr. 271.

On September 13, 2013, Dr. Hartzfeld performed Beitel's L4 laminectomy with L4-5

diskectomy on the right side.  Tr. 275-276.  At her first post-operative visit with Dr. Hartzfeld,

Dr. Hartzfeld noted that Beitel was doing "quite well."  Tr. 270.  Beitel's pre-operative leg pain

was significantly improved, which Beitel was very happy about.  Tr. 270.  Beitel was not

needing a lot of narcotic pain medicine. Tr. 270. At a subsequent post-operative visit on November 19, 2013, with Dr. Hartzfeld, Beitel complained of a recurrence of right leg pain over the prior several weeks. Tr. 269. Dr. Hartzfeld ordered an updated MRI to assess the matter and to help determine when Beitel would be able to return to work. Tr. 269. A new MRI was taken on November 26, 2013. Tr. 272. During her December 3, 2013, post-operative visit, Dr. Hartzfeld indicated that the new MRI showed "some expected scar at the operative level[,]" but there was no "lumbar stenosis or any new disk herniation or residual disk herniation." Tr. 268, 272. Dr. Hartzfeld recommended no further surgical intervention and started Beitel on Neurontin and Elavil at night. Tr. 268. Dr. Hartzfeld advised that Beitel should follow up with him as needed and nerve root blocks would be considered if Beitel's pain continued. Tr. 268.

At a later visit with Dr. Hartzfeld on January 14, 2014, Beitel complained of continued right leg pain and some back pain. Tr. 274. Dr. Hartzfeld recommended epidural cortisone shots and flexion-extension films of the lumbar spine. Tr. 274. Dr. Hartzfeld indicated that Beitel might need a lumbar fusion in the future depending on the results of the flexion-extension films of the lumbar spine. Tr. 274. Dr. Hartzfeld also stated, "At this point, I do not think she is clear to be able to return to work as she is still having significant pain and would probably not be able to participate in a full day of work activity at this time." Tr. 274.

A week later, on January 21, 2014, after obtaining flexion/extension imaging, Beitel saw Dr. Hartzfeld for follow up. Tr. 304. The lumbar spine flexion/extension imaging showed no significant abnormality. Tr. 294. Beitel's range of motion appeared normal and no instability was seen. Tr. 294, 304. Dr. Hartzfeld indicated he was not recommending surgical intervention at that point. Tr. 304. He discussed proceeding with pain management and the possibility of a spinal cord stimulator depending upon how she progressed with pain management. Tr. 304.

Beitel saw Dr. Neuendorf on January 23, 2014, for pain management. Tr. 352-354. Beitel reported that she had not gotten any better following her surgery. Tr. 352. Beitel had been taking Neurontin, Elavil, and breakthrough pain medicine but reported that she was still miserable. Tr. 352. Beitel had recently stopped taking the Neurontin because she was experiencing diarrhea. Tr. 352. Dr. Neuendorf's recommendations included right L3-4, L4-5, and L5-S1 transforaminal nerve block to help ease Beitel's pain and radicular symptoms down her right leg and the numbness and tingling sensations. Tr. 354. The first nerve block was administered on February 6, 2014. Tr. 347-349. The second nerve block was administered on March 6, 2014. Tr. 344-346. At that time, Beitel reported 100% relief for several days after the first injection and about 25-30% overall relief. Tr. 345. The third nerve block was administered on April 17, 2014. Tr. 339-341. At that time Beitel reported 60-70% relief from the first two injections. Tr. 339.

Beitel saw Dr. Neuendorf for follow up on May 22, 2014. Tr. 334-336. Beitel reported 50-60% increase in pain relief in her legs from the nerve blocks, with her strength being dramatically improved since the nerve blocks were administered. Tr. 334. However, Beitel was continuing to report chronic pain in her lower back associated with postlumbar laminectomy syndrome and into both hip areas and both upper legs consistent with degenerative changes of the lumbar spine. Tr. 334. Dr. Neuendorf's physical examination findings included positive straight leg raise on the right, mild arthritis in both hips and knees, significant muscle spasm and trigger point activity of the lumbar spine, and positive facet loading at L3-4, L4-5, and L4-S1. Tr. 335. Beitel indicated a desire to proceed with a spinal cord stimulator. Tr. 334, 336. During the administrative hearing, Beitel indicated that she never had the stimulator because she lost her job and insurance. Tr. 42.

Beitel saw Dr. Patel on July 18, 2014.  Tr. 361.  Beitel continued to complain of back pain with pain radiating to her right lower extremity.  Tr. 361.  She reported no improvement from surgery and no improvement from injections.  Tr. 361.  Beitel was taking Advil at night which helped a little.  Tr. 361.  Percocet and Hydrocodone upset her stomach.  Tr. 361.  On examination, Beitel exhibited paralumbar tenderness with muscle spasm, painful lumbar movement, and hyperactive right ankle reflex.  Tr. 361.

### 2.      Opinion evidence

#### a.      Treating physician

On July 18, 2014, Dr. Patel completed an assessment addressing Beitel's work-related abilities. Tr. 357-358.  Dr. Patel opined that Beitel's impairment limited her ability to perform work-related activities.  Tr. 357-358.

With respect to lifting/carrying, Dr. Patel opined that Beitel was limited to lifting/carrying not more than five pounds occasionally and frequently and only for a short period of time.  Tr. 357.  Dr. Patel stated that the following medical findings supported his assessment regarding lifting/carrying restrictions: "Pain – over back – worse and goes down to [right] lower extremity."  Tr. 357.

With respect to standing/walking, Dr. Patel opined that Beitel was limited to standing and/or walking for a total of 30 minutes without interruption in an 8-hour workday.  Tr. 357.

With respect to sitting, Dr. Patel opined that Beitel was limited to sitting for a total of 20-30 minutes without interruption in an 8-hour workday.  Tr. 357.  Dr. Patel indicated that the following medical findings supported his assessment regarding sitting: "Continuous sitting increases pain over back – has to stretch her back."  Tr. 357.

With respect to postural limitations, Dr. Patel opined that Beitel could never climb, balance, crouch or crawl and she could occasionally stoop and kneel. Tr. 357. Dr. Patel found no environmental limitations. Tr. 357.

Dr. Patel opined that Beitel would miss more than four days of work per month due to pain or fatigue and he expected that Beitel would be off task over 20% of the time during an 8-hour workday due to pain or fatigue. Tr. 358. Dr. Patel also opined that he expected that Beitel would need to lie down for two hours or more during the course of an 8-hour workday if she was working a sedentary job. Tr. 358. Beitel would be able to use her hands 80% of the time during an 8-hour workday. Tr. 358. Dr. Patel further opined that he expected that Beitel would need to take more than four unscheduled breaks, beyond one lunch break and a short morning and afternoon break, if she was working a sedentary job. Tr. 358.

At the end of the assessment, Dr. Patel was asked what medical findings supported his opinions. Tr. 358. In response, Dr. Patel stated: "Tenderness – paralumbar – with muscle spasm [;] painful and limited lumbar movement." Tr. 358.

### b. State agency reviewing physicians

On March 19, 2014, state agency reviewing physician Dr. Anne Prosperi, D.O., completed a physical RFC assessment. Tr. 59-61. Dr. Prosperi opined that Beitel was limited exertionally to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; she could stand and/or walk about 6 hours in an 8-hour workday; she could sit for about 6 hours in an 8-hour workday; she was limited to occasional pushing and/or pulling in her right lower extremity. Tr. 60. Dr. Prosperi explained the exertional limitations stating that:

> Clmt is s/p R L4-5 diskectomy 9/13/13 for an extruded disc fragment that had migrated superiorly. Post-op clmt reports some contd R leg pain – some days worse than others. New MRI obtained approx 2mos after surgery did not show any lumbar stenosis or new/residual disc herniation; there was some expected scar at the

operative level. TS also obtained F/E lumbar films which did not show any instability. No addl surgery is rec'd. Pain management rec'd. Exams have noted intact strength in UE's/LE's, neg slr, and negative Romberg. FO 1/29/14 did not note any abnormalities w/ sitting, standing, or walking.

Tr. 60.

Dr. Prosperi opined that Beitel had the following postural limitations: frequent kneeling; occasional climbing ramps/stairs, stooping, crouching, and crawling; and never climbing ladders/ropes/scaffolds. Tr. 60. Dr. Prosperi explained Beitel's postural limitations by referring to the explanation she provided for the exertional limitations. Tr. 60. With respect to environmental limitations, Dr. Prosperi opined that Beitel would need to avoid exposure to unprotected heights. Tr. 61. Dr. Prosperi found no manipulative, visual, or communicative limitations. Tr. 60-61.

Upon reconsideration, on May 7, 2014, state agency reviewing physician Dr. John L. Mormol, M.D., completed a physical RFC assessment. Tr. 81-83. Dr. Mormol reached the same conclusions as Dr. Prosperi. Tr. 59-61, 81-83.

**C.      Hearing testimony**

**1.      Plaintiff's testimony**

Beitel testified and was represented at the hearing. Tr. 19, 34, 38-48.

Beitel discussed the back surgery that she had in 2013. Tr. 40. Following surgery, Beitel did not undergo physical therapy. Tr. 42. Beitel indicated that the pain in her back and leg was about the same after her surgery. Tr. 43. In 2014, Beitel saw Dr. Hartzfeld about a possible fusion and he sent her to a pain management doctor. Tr. 44. Through pain management, Beitel received a total of six injections but without relief. Tr. 44.

Beitel was currently having constant pain in her low and middle back and down her right leg. Tr. 40. For her pain, she takes over-the-counter Tylenol. Tr. 39. Although her pain is

constant, Beitel indicated that some days were worse than others and she estimated taking Tylenol three times each week. Tr. 39, 40-41. Tylenol takes the edge off but does not make her pain go away completely. Tr. 41. She does not take prescription pain medication because it makes her sick to her stomach. Tr. 39. She last took Percocet about a year prior to the hearing. Tr. 39. Beitel has not used a TENS unit. Tr. 42. There had been discussions about the possibility of a stimulator but Beitel lost her job and eventually lost her insurance so she never had a stimulator. Tr. 42.

Activity, including standing, walking and sitting for long periods of time, makes Beitel's pain worse. Tr. 41. She estimated being able to sit, at most, for 20 minutes. Tr. 41. After sitting for that amount of time, Beitel gets severe pain and she has to lie down. Tr. 41. Beitel has to lie down for about an hour or hour and a half before she can get back up. Tr. 41. She can stand for about five minutes before she starts to have severe pain. Tr. 41. Beitel's pain interferes with her sleep – she is constantly awake and cannot find a comfortable spot and sometimes, she has to get up and walk for a few minutes. Tr. 42. Considering breaks in her sleep, Beitel estimated sleeping about three hours at night. Tr. 42-43. She lies down during the day but does not nap. Tr. 43. Weather, especially cold weather, makes Beitel's pain worse. Tr. 43.

During the day, Beitel mostly lies down and watches television. Tr. 44. Because of her back pain, Beitel has problems doing things around the house, like dishes. Tr. 43. She has to sit on a stool to do dishes and can only do dishes for five minutes before having to lie down. Tr. 43. Beitel can cook for herself but mostly small meals. Tr. 45. She does one load of laundry approximately every other day. Tr. 45. Beitel has a car and drives maybe twice a week to go to the grocery store or medical appointments. Tr. 45. Beitel has family that visits her. Tr. 45.

## 2.    Vocational expert's testimony

Vocational Expert Thomas Nimberger ("VE") testified at the hearing.  Tr. 48-52.
Initially, the ALJ indicated to the VE that, for his hypotheticals, he was going to exclude Beitel's
past jobs based on her testimony.  Tr. 49.   The ALJ then proceeded to ask the VE to consider an
individual of the same age and education as Beitel and with the same past work as described by
the VE[3] who can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; can
sit for 6 hours and can stand and/or walk for 6 hours in a normal workday; cannot climb ladders,
ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, crouch,
kneel and crawl; must avoid workplace hazards such as unprotected heights or exposure to
dangerous, moving machinery.  Tr. 49-50.  The ALJ then asked the VE whether there would be
jobs in the national economy for someone who was limited as described in the ALJ's first
hypothetical.  Tr. 50.  The VE indicated there would be jobs available and identified the
following examples: (1) packager, an unskilled, light job; (2) a bench assembler, an unskilled,
light job; and (3) housekeeping/office cleaner job, an unskilled, light job.[4]  Tr. 50.

Next, the ALJ asked the VE to consider the individual described in the first hypothetical
with the further limitation of needing two 30-minute breaks, in addition to the normal breaks and
normal lunch period, during which time the individual would be allowed to lie down.  Tr. 50-51.
The VE indicated that, with that additional restriction, there would be no jobs available to the
described individual.  Tr. 50-51.

---

[3] The VE described Beitel's past work in a form completed on September 11, 2015, indicating that Beitel had past work as a material handler (a heavy job), a printing press operator (a light job), and a printing inspector (a light job). Tr. 235.

[4] The VE provided national job incidence data for the jobs identified.  Tr. 50.

Lastly, the ALJ asked the VE to consider the individual described in the first hypothetical with the further limitation of missing work at least four days per month due to medical issues. Tr. 51. The VE indicated that, with that amount of absenteeism, there would be no jobs available to the described individual. Tr. 51.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his October 14, 2015, decision, the ALJ made the following findings:[6]

1.    Beitel meets the insured status requirements of the Social Security Act through December 31, 2018.    Tr. 21.

2.    Beitel has not engaged in substantial gainful activity since the alleged onset date of May 3, 2013.  Tr. 21.

3.    Since the alleged onset date of disability, May 3, 2013, Beitel has had the following severe impairments: lumbar degenerative disc disease and diabetes mellitus.[7]  Tr. 22.

4.    Since the alleged onset date of disability, May 3, 2013, Beitel has not had an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 22.

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[6] The ALJ's findings are summarized.

[7] The ALJ also found non-severe impairments of otitis externa and dyslipidemia. Tr. 22.

5.      Since May 3, 2013, Beitel has the RFC to perform light work except that she can never climb ladders, ropes or scaffolds but she can occasionally climb ramps and stairs; she can occasionally stoop, crouch, crawl and kneel; she must avoid workplace hazards, such as unprotected heights or exposure to dangerous moving machinery. Tr. 22-25.

6.      Since May 3, 2013, Beitel has been unable to perform any past relevant work. Tr. 25.

7.      Prior to the disability onset date, Beitel was an individual closely approaching advanced age. Applying the age categories non-mechanically, and considering the additional adversities in this case, on April 28, 2015, Beitel's age category changed to an individual of advanced age. Tr. 25.

8.      Beitel has at least a high school education and is able to communicate in English. Tr. 26.

9.      Prior to April 28, 2015, transferability of job skills is not material to the determination of disability. Beginning on April 28, 2015, Beitel has not been able to transfer job skills to other occupations. Tr. 26.

10.     Prior to April 28, 2015, the date Beitel's age category changed, considering Beitel's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Beitel could have performed, including packager, bench assembler, and office cleaner. Tr. 26-27.

11.     Beginning on April 28, 2015, the date Beitel's age category changed, considering Beitel's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that Beitel could perform. Tr. 27. A finding of "disabled" is reached by direct application of Medical-Vocational Rule 202.06. Tr. 27.

Based on the foregoing, the ALJ determined that Beitel was not disabled prior to April 28, 2015, but became disabled on that date and continued to be disabled through the date of the decision. Tr. 27.

## V. Parties' Arguments

Beitel argues that the ALJ failed to provide valid reasons for providing little weight to the opinion of her treating physician Dr. Patel. She also argues the ALJ failed to properly assess her credibility because the ALJ relied on minor activities of daily living.

In response, the Commissioner argues the ALJ properly considered and weighed Dr. Patel's opinion and properly assessed Beitel's credibility.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc.*

*Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.      Treating physician rule

Beitel contends that the ALJ erred when she did not assign controlling weight to the

physical functional capacity report of her treating physician Dr. Patel.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling

weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must

give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

reviewers the weight given to the treating physician's opinion and the reasons for that weight.

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ

must consider factors such as (1) the length of the treatment relationship and the frequency of the

examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the

opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of

the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v.*

*Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not

obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when

weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ considered and weighed the medical opinion evidence. With respect to Dr. Patel's opinion, the ALJ explained:

> I do not give controlling weight to Dr. Patel's opinion. While he treated the claimant, the evidence did not support his conclusions. The claimant had ongoing pain, but she could generally walk and she had normal strength, suggesting that the claimant was capable of more than Dr. Patel asserted. Additionally, there was no explanation of the basis for the assertions that the claimant would miss work regularly, she would be off task, and that she would have to lie down. Accordingly, I grant little weight to Dr. Patel's assessment.

Tr. 25.

Beitel argues that the ALJ's reasons are not good reasons for discounting Dr. Patel's opinion because objective examination findings, including decreased reflexes, positive neurogenic claudication of the right leg, positive heel to toe walk, positive straight leg raising, and significant muscle spasms, are evidence that Beitel's ability to walk is compromised and support Dr. Patel's less than sedentary functional capacity assessment. Doc. 11, p. 1 (citing Tr. 335 (5/22/2014 examination findings); Tr. 353 (1/23/2014 examination findings)). In light of this evidence, Beitel argues that the ALJ's decision to discount Dr. Patel's opinion based on a finding that Beitel could generally walk and had normal strength is not a good reason under the treating physician rule and/or is not sufficiently explained. The undersigned agrees.

First, it is unclear what is meant by Beitel "could generally walk." Further, both before and after her surgery, Beitel exhibited abnormal examination findings. The ALJ does not sufficiently explain how these findings are not supportive of Dr. Patel's opinions. For example, on June 13, 2013, Beitel saw Dr. Neuendorf and, on examination, Dr. Neuendorf observations included positive neurogenic claudication in Beitel's right leg, positive sensory deficit in the

right leg, mild arthritis in both hips and knees, and positive facet loading at L3-4, L4-5, and L5-S1. Tr. 292. Although one post-surgical examination in May 2014 noted that Beitel's strength had dramatically improved following her transforaminal nerve blocks, Beitel was continuing to have chronic pain in her lower back and hip and upper leg area. Tr. 334. Further, during that same May 2014 post-surgical visit, Dr. Neuendorf's examination findings included positive neurogenic claudication of the right leg, positive straight leg raises, significant lumbar spine muscle spasms, and mild arthritis in both hips and knees. Tr. 335. These examination findings were also observed during an earlier January 2014 visit with Dr. Neuendorf. Tr. 353. Also, Dr. Patel examined Beitel in July 2014 and observed paralumbar tenderness with muscle spasm, painful lumbar movement, and hyperactive right ankle reflex. Tr. 361. Considering Beitel's pre- and post-operative abnormal examination findings, the ALJ's cursory and vague explanation for the weight assigned to Dr. Patel's opinion falls short of satisfying the treating physician rule. A more thorough explanation is necessary in order to allow meaningful judicial review.

Further, as Beitel argues, the ALJ's second reason for discounting Dr. Patel's opinion, i.e., that "there was no explanation of the basis for the assertions that the claimant would miss work regularly, she would be off task, and that she would have to lie down" (Tr. 25), is unsupported by the record. Dr. Patel was asked - "What are the medical findings which support your opinions?" Tr. 358. In response, Dr. Patel stated "Tenderness – paralumbar – with muscle spasm[;] painful and limited lumbar movement." Tr. 358. In light of the foregoing, the ALJ's finding that <u>no</u> explanation was provided is simply not supported by the record. Accordingly, the undersigned cannot find this stated reason for discounting Dr. Patel's opinion to be a good reason.

Based on the foregoing, the undersigned concludes that the ALJ's reasons for providing little weight to Dr. Patel's opinion fall short of satisfying the treating physician rule. Therefore, the undersigned recommends that the Court remand this matter for further proceedings to ensure that the requirements of the treating physician rule are met.

## B.     Credibility analysis

Beitel contends that the ALJ's credibility assessment is flawed because the ALJ relied on minor activities of daily living.   In light of the above recommendations with respect to Dr. Patel's opinion, the Court need not address Beitel's alternative argument because, on remand, the ALJ's further evaluation of the medical opinion evidence may have an impact on his findings with respect to Beitel's credibility.  *See e.g., Trent v. Astrue*, 2011 WL 841538, *7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).  However, for purposes of completeness, the undersigned provides the following analysis of Beitel's alternative argument.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and

aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken

to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of

pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other

factors concerning functional limitations and restrictions due to pain or other symptoms. 20

C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims:*

*Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996)

("SSR 96-7p").[8] "An ALJ's findings based on the credibility of the applicant are to be accorded

great weight and deference, particularly since an ALJ is charged with the duty of observing a

witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility

must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370,

371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

The ALJ explained his assessment of Beitel's credibility stating:

> With respect to the claimant's alleged limitations, I find such assertions only partially credible. The record shows that she had ongoing back pain with some involvement of her right lower extremity. Nevertheless, the evidence fails to show that the claimant had any substantial ongoing problems with her gait. Additionally, she engaged in a variety of daily activities, including cooking, doing laundry, driving, and shopping (3E; Testimony). Such activity level suggests that the claimant remained capable of performing at least light level work. Furthermore, she had relatively little treatment over the last year and she testified that she took only over the counter pain medication. Such treatment course is inconsistent with the severe level of dysfunction that the claimant described.

Tr. 25.

Beitel's challenge to the ALJ's credibility analysis is focused on the ALJ's consideration

of her activities of daily living. However, daily activities are a proper factor to be considered

when assessing pain and other symptoms. Furthermore, it is not for this Court to "try the case *de*

*novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at

---

[8] SSR 16-3p, with an effective date of March 28, 2016, supersedes SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

387.  Additionally, the ALJ did not rely solely on Beitel's daily activities to conclude that her subjective statements regarding the limiting effects of her symptoms were not entirely credible. For example, the ALJ considered that there was limited treatment over the prior year and that Beitel was taking only over-the-counter medication.  Tr. 25.

Considering the foregoing, absent the above discussed error with respect to ALJ's consideration of Dr. Patel's opinion, the undersigned would recommend that the Court find that the ALJ did not err in assessing Beitel's credibility.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision for further proceedings to ensure adherence to the treating physician rule.

August 30, 2017

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).